PREET BHARARA
United States Attorney for the
Southern District of New York
By:     NIKETH VELAMOOR / HAGAN SCOTTEN
        Assistant United States Attorneys
        One Saint Andrew's Plaza
        New York, New York 10007
        Tel. (212) 637-1076 / (914) 993-1924

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                          :

                                                  :

                -v.-                              :        VERIFIED CIVIL COMPLAINT

                                                  :        16 Civ.

$48 MILLION IN UNITED STATES CURRENCY,

                                                  :

                Defendant-in-rem.

                                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff United States of America, by its attorney Preet Bharara, United States

Attorney for the Southern District of New York, for its verified civil complaint, alleges, upon

information and belief, as follows:

## I.  JURISDICTION AND VENUE

1.      This action is brought pursuant to Title 18, United States Code, Section 981

by the United States of America seeking the forfeiture of $48 Million in United States currency

(the "Defendant Funds" or the "Defendant-in-rem").

2.      This Court has jurisdiction pursuant to Title 28, United States Code, Section

1355.

3.     Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because certain actions and omissions giving rise to forfeiture took place in the Southern District of New York and pursuant to Title 28, United States Code, Section 1395 because the Defendant Funds have been transferred to the Southern District of New York.

4.     The Defendant Funds constitute proceeds of wire fraud, in violation of Title 18, United States Code, Sections 1343, property involved in money laundering, in violation of Title 18, United States Code, Section 1956, and property traceable to such property; and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (C).

## II.  PROBABLE CAUSE FOR FORFEITURE

### *Background*

5.     On or about February 8, 2016, a federal Grand Jury, sitting in the Southern District of New York, returned an Indictment (the "Indictment") charging Scott Tucker ("Tucker") and Timothy Muir with, *inter alia*, collection of unlawful debts, in violation of Title 18, United States Code, Section 1962, in connection with the unlawful activities of a group of payday lending businesses (the "Tucker Payday Lenders") that issued small, short-term, high-interest, unsecured loans, commonly referred to as "payday loans," to customers across the country.   A true and correct copy of the Indictment is attached hereto as Exhibit A and fully incorporated by reference herein.

6.     Beginning in 2003, in order to conceal his ownership and control of the Tucker Payday Lenders and to thwart state authorities' anti-usury enforcement efforts, Tucker entered into an arrangement with three Native American Tribes (the "Tribes"), including the Miami Tribe of Oklahoma (the "Miami Tribe"), to operate the Tucker Payday Lenders through

2

various entities established and nominally owned by the Tribes.  Tucker also transferred the proceeds of the Tucker Payday Lenders' unlawful activities through bank accounts held in the names of the Tribes in order to conceal his ownership and control of those funds.  Among the entities involved in this activity were AMG Services, Inc., f/k/a CLK Management, f/k/a National Money Service, Inc. ("AMG") and MNE Services, Inc. ("MNES"; AMG and MNES are collectively referred to herein as the "Entities"), two corporations established by the Miami Tribe.

7.     On or about February 9, 2016, the Entities entered into a Non-Prosecution Agreement (the "NPA") with the United States, wherein, *inter alia*, the Entities agreed to forfeit a total of $48 million to the United States.  Incorporated in the Agreement is a Statement of Facts ("SoF") that the Entities agree is true and accurate.  The NPA, including the SoF, is attached hereto as Exhibit B and fully incorporated herein.

### The Defendant Funds

8.     As set forth further below and in the Indictment, NPA and SoF, the Tucker Payday Lenders' activities constituted a fraudulent scheme targeting millions of borrowers that involved the use of interstate wire communications, with hundreds of millions of dollars in proceeds of the scheme laundered through entities and bank accounts nominally held by tribal entities in order to conceal Tucker's ownership and control.

9.     On or about February 29, 2016, pursuant to the NPA, the Entities transferred the Defendant Funds, which represent proceeds of the Tucker Payday Lenders' unlawful activities which had been transferred to bank accounts controlled by the Entities, to a seized asset deposit account maintained by the United States Department of the Treasury in the Southern District of New York.

3

10.     Accordingly, as set forth below, the Defendant Funds are forfeitable as proceeds of the wire fraud scheme, and as property involved in money laundering.

*The Unlawful Payday Lending Scheme*

11.     From at least in or about 1997 up to and including in or about August 2013, Tucker owned and operated the Tucker Payday Lenders, which held themselves out as separate businesses known as Ameriloan, f/k/a Cash Advance ("Ameriloan"), One Click Cash, f/k/a Preferred Cash Loans ("OCC"), United Cash Loans, US FastCash, 500 FastCash, Advantage Cash Services and Star Cash Processing.  However, while each of the Tucker Payday Lenders issued a distinct portfolio of loans, the Tucker Payday Lenders shared the employees, computer systems and other operating costs and infrastructure of a single lending business located in Overland Park, Kansas.  That business, known as AMG, was at all relevant times directly or beneficially owned and operated by Tucker.[1]  Further, Tucker and/or other AMG employees at his direction made the credit, strategic, and other material decisions, directed and carried out the servicing and collection of loan obligations, managed relationships with third parties (including banks and payment processors, among others), and performed the other substantive financial and operational functions for the Tucker Payday Lenders.  At times, under Tucker's direction and control, AMG employed over 600 individuals to operate the Tucker Payday Lenders.

12.     The Tucker Payday Lenders systematically exploited over four and a half million working people throughout the United States who were struggling to pay basic living expenses, including for food and housing.  The Tucker Payday Lenders extended loans to these individuals at usurious interest rates as high as 700% or more using deceptive and misleading

---

[1] Tucker and others orchestrated a sham acquisition of a prior Tucker entity, CLK Management, by AMG to further the impression that the lending business was tribally-owned.

4

communications and contracts, and in violation of the usury laws of numerous states, including

New York State, that were designed to protect residents from such loan sharking and abusive

conduct.   In doing so, the Tucker Payday Lenders forced many of these individuals into cycles of

debt in which they incurred new usurious payday loans – including from the Tucker Payday

Lenders – in order to pay off their existing debts.

13.     As detailed in the Indictment, fourteen states, including New York State,

and the District of Columbia, prohibit payday loans or have usury limits that effectively prohibit

all payday loans within their jurisdictions.   For example, in relevant part, New York's civil usury

law prohibits charging more than 16% interest on a loan annually, and New York's criminal usury

law makes it a crime to knowingly charge more than 25% interest on a loan annually.   Arizona,

Arkansas, Connecticut, the District of Columbia, Georgia, Maryland, Massachusetts, Montana,

New Hampshire, New Jersey, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia

similarly have laws which set interest limits that effectively prohibit payday lending.   While the

lawful maximum interest rate varies in these states, the highest permissible annual interest rate in

any of these states is 36%.   With the exception of Georgia, West Virginia and (after July 1, 2010)

Arizona, the Tucker Payday Lenders did business in all of these states, while charging annual

interest rates many times higher than the rates allowed in these states.

14.     The Tucker Payday Lenders extended loans to millions of consumers across

the country.   In New York, for example, between approximately 2008 and 2012, the Tucker

Payday Lenders extended loans to hundreds of thousands of individuals including, as to each

Tucker Payday Lender, individuals in the Southern District of New York.

15.     The Tucker Payday Lenders generated enormous revenues and profits.   In

particular, from approximately 2003 to 2012, the Tucker Payday Lenders generated over $2 billion

in revenues from which Tucker received hundreds of millions of dollars in profits. In addition to accumulating hundreds of millions of dollars in certain bank accounts under his direct or beneficial ownership and control, Tucker also spent over $100 million of these unlawfully obtained profits on personal expenses such as luxury homes and automobiles, jewelry, a private airplane, and the expenses of a professional auto racing team which, according to its web site, races Ferraris in "Marquee" events throughout the world.

*The Deceptive and Misleading Truth In Lending Act ("TILA") Disclosures*

16.     The websites of the Tucker Payday Lenders informed the potential customers of the loan amount they could receive, which was based in part on the potential customers' claimed income and employment.   The websites then required the potential customers electronically to indicate that they had read certain documents on the website, including a "Loan Note and Disclosure," and that they preauthorized electronic funds withdrawals from their accounts by the Tucker Payday Lenders to repay the loan.   Thereafter, the Tucker Payday Lenders made the loan amounts available by electronic deposit as soon as the next day.

17.     The Tucker Payday Lenders' Loan Note and Disclosure prominently featured, in a large, bold box, a "Disclosure of Credit Terms" (the "TILA Box") that purported to state in clear and simple terms, as required by TILA, the cost of the loan to the borrower.   For example, for a loan of $500, the TILA Box provided that the "FINANCE CHARGE" – meaning the "dollar amount the credit will cost you" – would be $150, and that the "Total of Payments" – meaning the "amount you will have paid after you have made the scheduled payment" – would be $650.   Thus, in substance, the TILA Box stated that a $500 loan to the customer would cost $650 to repay.   In addition, the TILA Box also set forth the annualized interest rate of such of a loan, namely, 782.14%.   While the amounts set forth in the Tucker Payday Lenders' TILA Box varied

according to the terms of particular customers' loans, they reflected, in substance, that the borrower would pay $30 in interest for every $100 borrowed.

18.     In truth and in fact, the Tucker Payday Lenders' TILA boxes were materially deceptive and misleading.   While the TILA Box suggested the borrower would pay $30 in interest for every $100 borrowed, in truth and in fact, through at least 2012, Tucker and his co-conspirators structured the repayment schedule of the loans such that, on the borrower's payday, the Tucker Payday Lenders automatically withdrew the entire interest payment due on the loan but left the principal balance untouched so that, on the borrower's next payday, they could again automatically withdraw an amount equaling the entire interest payment due (and already paid) on the loan.   The Tucker Payday Lenders proceeded automatically to withdraw such "finance charges" payday after payday (typically every two weeks), applying none of the money toward repayment of principal until at least the fifth payday, when they began to withdraw an additional $50 per payday to apply to the principal balance of the loan.   Even then, the Tucker Payday Lenders continued to assess and automatically withdraw the entire interest payment calculated on the remaining principal balance until the entire principal amount was repaid. Accordingly, the Tucker Payday Lenders' TILA box materially understated the amount the loan would cost, including the total of payments that would be taken from the borrower's bank account.

*Use of Native American Tribes to Conceal the Ownership*
*and Control of the Tucker Payday Lenders and their Assets*

19.     Throughout their existence, the Tucker Payday Lenders received complaints from thousands of customers across the country, and numerous state regulators and consumer protection groups, about the lenders' deceptive, misleading, and usurious practices.

7

Beginning in 2003, several states filed lawsuits to stop Tucker and the Tucker Payday Lenders from extending usurious and abusive loans to their citizens in violation of their respective laws.

20.     In order to thwart state authorities' enforcement efforts, beginning in 2003, Tucker entered into sham business relationships with the Tribes, and then claimed that "tribal sovereign immunity" prevented states and private citizens from taking any action against the Tucker Payday Lenders or him.   Thereafter, in the lawsuits, Tucker's lawyers prepared and submitted materially false and misleading affidavits about the Tribes' supposed substantive ownership and control of the Tucker Payday Lenders, whereupon courts eventually dismissed each state's lawsuit on "tribal sovereign immunity" grounds.   As the Entities admitted in the SoF, these affidavits "were false, in part, because they overstated the involvement of. . .The Miami [Tribe] and/or entities controlled by the Miami in the operation of the loan business."

21.     In truth and in fact, while Tucker took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, the Tribes played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time.   To create the sham appearance of ownership, Tucker assigned nominal ownership of the Tucker Payday Lenders to tribal entities, including MNES (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to the Miami Tribe), and from time to time caused the Tribes to appear as the businesses' owners on certain corporate and financial documents.   However, in truth and in fact, at all relevant times, the Tribes had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

8

22.     Similarly, to create the sham appearance that the Tribes, including the
Miami Tribe, not only owned, but operated, the Tucker Payday Lenders, Tucker caused members
of the Miami Tribe and another tribe to have a tribal member press a key on a computer on a daily
basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of
loans that the Tucker Payday Lenders made even though, as the Entities admitted in the SoF, "[a]ll
essential steps necessary for the approval of loans were performed in Overland Park, under the
direction of Tucker and individuals ultimately reporting to Tucker."

23.     To further create the false appearance of tribal ownership and operation of
the Tucker Payday Lenders, AMG employees falsely claimed to customers and others on the
telephone that they were located in Oklahoma or Nebraska, where the Tribes were located.   In
addition, employees were provided with daily weather reports for these locations so that they could
more effectively dupe customers and others into believing they were located there, when in truth
and in fact, they were located at all times at AMG's offices in Kansas.

24.     Contrary to the sham appearance that the defendants created of tribal
ownership and control of the Tucker Payday Lenders, at all times, and as the Entities admitted in
the SoF, Tucker remained the source of capital for the Tucker Payday Lenders, Tucker bore the
financial risk associated with the operation of the businesses, and Tucker owned and controlled the
Tucker Payday Lenders' profits.   As the Entities further admitted in the SoF, "Tucker and others
based in Overland Park, Kansas, and not [the Miami Tribe,] managed operations and created the
loan approval criteria."   In particular, Tucker and/or other AMG employees at his direction made
the credit, strategic, and other material decisions, directed and carried out the servicing and
collection of loan obligations, managed relationships with third parties (including banks and

9

payment processors, among others), and performed the other substantive financial and operational functions for the Tucker Payday Lenders.

25.     In order to further the impression that the Tucker Payday Lenders were tribally-owned, Tucker opened numerous bank accounts in the names of nominally tribal companies, including AMG and MNES, through which Tucker and his subordinates conducted the payday lending business (the "Tribal Accounts").  As the Entities admitted in the SoF, Tucker "opened or caused to be opened certain bank accounts in the names of entities controlled by The Miami" and that "[n]either the Miami nor any entity that it controlled exercised control over these accounts."  In total, hundreds of millions of dollars in proceeds from the Tucker Payday Lenders, including the Defendant Funds, flowed through the Tribal Accounts.  Tucker used monies in the Tribal Accounts to fund additional payday loans to borrowers.  Tucker also used tens of millions of dollars in funds held in these Tribal Accounts for his own personal expenses.

26.     As part of the NPA, the Entities agreed that the Defendant Funds represent proceeds of the Tucker Payday Lenders and further agreed not to contest that the Defendant Funds are subject to forfeiture to the United States.

### III.  CLAIM FOR FORFEITURE

27.     Incorporated herein are the allegations contained in paragraphs 1 through 26 of this Verified Civil Complaint.

28.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

29.     "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7), and the term includes, among other things, any offense listed under Title 18, United States Code, Section 1961(1).

30.     Title 18, United States Code, Section 1961(1) lists, among other offenses, violations of Title 18, United States Code, Section 1343 (relating to wire fraud).

31.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

32.     By reason of the foregoing, the Defendant Funds are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), because there is probable cause to believe that the Defendant Funds constitutes property derived from proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343, and pursuant to Section Title 18, United States Code, Section 981(a)(1)(A), because there is probable cause to believe that the Defendant Funds constitute property involved in money laundering, in violation of Title 18, United States Code, Section 1956.   In particular, there is probable cause to believe that the Defendant Funds were the proceeds of specified unlawful activity and were involved in transactions conducted with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and with knowledge that the transactions were designed, at least in part, to conceal or disguise the nature, source, ownership and/or control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Funds and that all persons having an interest in the

11

Defendant Funds be cited to appear and show cause why the forfeiture should not be decreed, and

that this Court decree forfeiture of the Defendant Funds to the United States of America for

disposition according to law, and that this Court grant plaintiff such further relief as this Court may

deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
     March 30, 2016

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York
                    Attorney for the Plaintiff
                    United States of America

By:    _____

                    NIKETH VELAMOOR
                    HAGAN SCOTTEN
                    Assistant United States Attorneys
                    One St. Andrew's Plaza
                    New York, New York 10007
                    Telephone: (212) 637-1076 / (914) 993-1924

## VERIFICATION

STATE OF NEW YORK )
COUNTY OF NEW YORK :
SOUTHERN DISTRICT OF NEW YORK )

JERRY D. WHITTEN, being duly sworn, deposes and says that he is a Special Agent with the United States Internal Revenue Service, and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

The sources of deponent's information on the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of alleged violations of Title 18 of the United States Code.

JERRY D. WHITTEN
Special Agent
United States Internal Revenue Service

Sworn to before me this
28th day of March 2016

NOTARY PUBLIC

SANDIE KISTLER
Notary Public - State of Kansas
My Appt. Expires

13